TINDER, Circuit Judge,
dissenting.
The admission of Julie’s letter and testimonial statements to Officer Kosman violated Jensen’s confrontation rights, but the Wisconsin Court of Appeals affirmed his conviction, holding that the error was harmless beyond a reasonable doubt under Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Fair-minded jurists could disagree with that holding. Indeed, my colleagues in the majority, who epitomize fair-mindedness, disagree, and make a strong case for doing so. But I submit that fairminded jurists could also agree with the Wisconsin Court of Appeals. And because we owe great deference to the state court’s decision, we are not in a position to choose between two fairminded alternatives. I would uphold the decision of the Wisconsin Court of Appeals as a reasonable application of Chapman. Therefore, I respectfully dissent.
In Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court established the harmless-error standard that applies “in determining whether habeas relief must be granted because of constitutional error of the trial type.” Id. at 638, 113 S.Ct. 1710. The test is “whether the error had substantial and injurious effect or influence in determining the jury’s verdict.” Id. at 637, 113 S.Ct. 1710 (quotation omitted). In other words, there must be “actual prejudice.” Id. (quotation omitted).
Three years after [the Court] decided Brecht, Congress passed, and the President signed, the Antiterrorism and Effective Death Penalty Act of 1996 (AED-PA), under which a habeas petition may not be granted unless the state court’s adjudication “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the *909 Supreme Court of the United • States----”
Fry v. Pliler, 551 U.S. 112, 119, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (quoting 28 U.S.C. § 2254(d)(1)).
The Court recently held that when a state prisoner “seeks federal habeas corpus relief, he must meet the Brecht standard, but that does not mean ... that a state court’s harmlessness determination has no significance under Brecht.” Davis v. Ayala, — U.S. -, 135 S.Ct. 2187, 2198, 192 L.Ed.2d 323 (2015). Rather, “[w]hen a Chapman decision is reviewed under AEDPA, ‘a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable.’ ” Id. at 2199 (quoting Fry, 551 U.S. at 119, 127 S.Ct. 2321). “And a state-court decision is not unreasonable if ‘fairminded jurists could disagree on [its] correctness.’ ” Id. (quoting Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)) (internal quotation marks omitted). Thus, to prevail, a petitioner “must show that the state court’s decision to reject his claim ‘was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.’ ” Id. (quoting Richter, 562 U.S. at 103, 131 S.Ct. 770).
As assumed by the Wisconsin Court of Appeals, the admission of Julie’s letter and testimonial statements to Officer Kosman violated the Confrontation Clause. However, to obtain habeas relief, Jensen “must show that he was actually prejudiced by this [violation], a standard that he necessarily cannot satisfy if a fairminded jurist could agree with the [state court’s] decision that the [violation] met the Chapman standard of harmlessness.” Id.
The Wisconsin Court of Appeals examined Julie’s letter line by line, and it explained in great detail how all of Julie’s statements in the letter were duplicative of other, admissible evidence. State v. Jensen (Jensen II), 331 Wis.2d 440, 794 N.W.2d 482, 495-98 (App.2010). It did the same with Julie’s testimonial statements to Officer Kosman. Id. at 498-99. For example, Jensen’s sister, Laura Koster, testified that Julie told her that she thought Jensen might be planning to kill her. Koster also testified that Julie showed her a photo of a list from Jensen’s day planner and something that “looked like a syringe.”
Tadeusz Wojt, Julie’s neighbor, testified that during the three weeks prior to Julie’s death, Julie was upset and “scared she was go[ing] to die,” because Julie feared that Jensen was trying to poison her by “putfting] something in the wine” Jensen insisted Julie drink. Wojt also testified that Julie told him that she did not think she would make it through one particular weekend because she had found suspicious notes written by her husband and she had seen a computer page about poisoning that Jensen had left open on the home computer. Wojt testified that Julie repeatedly told him about marital problems she and Jensen were having.
Therese DeFazio, Julie’s son’s teacher, testified that a week before her death, Julie told DeFazio that she thought Jensen was trying to kill her and “was going to make it look like a suicide.” DeFazio said Julie told her about a list written by Jensen that included “syringes ... and drugs and items like that,” and Julie feared that Jensen was going to try to give her an overdose of drugs by putting them in her food or drink. DeFazio testified that Julie said that Jensen “never forgave her” for the affair she had eight years earlier. De-Fazio also testified that in August 1998 she asked Julie to help in the computer lab with the children, and Julie said, “[0]h, I can’t do that, I don’t even know how to turn one on.” DeFazio testified that Julie’s son told DeFazio that he was teaching *910 his mother how to use a computer because “she didn’t know how.” DeFazio testified that Julie said she gave her neighbor a note, “saying that if my husband ever kills me please believe that I did not commit suicide, I would never do that because I love my children and I wouldn’t do that to my children.”
Dr. Richard Borman, Julie’s physician, testified that two days before her death, Julie denied being suicidal and said she loved her children “more than anything and they were the most important thing in the world to her,” and she did not want to lose them. Dr. Borman said Julie alluded to an affair that she had in the past and said she believed that Jensen had “never really forgiven” her for it.
Jensen’s friend and co-worker, David Nehring, testified that soon after he met Jensen, sometime around 1990 or 1991, Jensen told him about Julie’s brief affair. Nehring testified that eight years after telling him about the affair, Jensen’s anger had not diminished. He said that “[Jensen] remained upset about [the affair] and distressed over it for as long as I knew him.” Nehring described Jensen’s computer skills as “above average,” and testified that during the month before Julie’s death, Jensen conducted Internet searches on drug interactions “on a very frequent basis.” Nehring testified that Jensen said he was trying to get Julie to relax by offering her glasses of wine at night, but she was resisting his efforts. Nehring also testified that a day after Nehring told Jensen he was surprised the police had not seized Jensen’s work computer as part of the investigation into Julie’s death, Jensen reported that his work computer “had been fried and he’d have to get a new one.”
The State presented evidence indicating that Jensen repeatedly placed pornographic photos around the house for Julie to find and that Jensen knew Julie believed her former paramour was planting them. Jensen denied knowing the origin of the pornographic photos, but he told the investigating officer, Detective Paul Ratzburg, that he began saving the photos and using them to upset Julie when “something would happen” that caused him to “get pissed off.” Detective Ratzburg said Jensen explained that sometimes Jensen would leave the photos out for Julie to find and other times he would bring them out, show them to Julie and tell her that he “found these in the shed.” Detective Ratzburg testified that Jensen admitted that their marriage was never the same after Julie’s affair.
Detective Ratzburg also testified that Jensen told him that on the morning of Julie’s death, Julie “could hardly sit up,” she “was not able to get out of bed,” and she “was not able to move around and function.” Jensen said he propped Julie up in bed at 7:30 a.m., and he did not leave home that morning until 8:00 or 9:00 a.m. This timetable is significant because of computer evidence that, at 7:40 a.m. on the day of Julie’s death, a search for “ethylene glycol poisoning” was conducted on the Jensen home computer and then the user double-deleted that morning’s Internet history. Computer evidence also revealed that, two months earlier, the Jensen home computer was used to search for methods of poisoning on the same day Jensen and his then-paramour exchanged emails planning their future together.
In short, there were multiple sources of admissible evidence duplicating (or corroborating) every relevant aspect of Julie’s erroneously admitted testimonial statements. In particular, Julie’s letter and statements to Officer Kosman were not the only times Julie told her story; during the same time period, she told variations of the same story to multiple people. This contributed to what the Wisconsin Court of Appeals described as “the staggering *911 weight of the untainted evidence and cumulatively sound evidence presented by the State,” which led the court to conclude that “the State has proven beyond a reasonable doubt that any error complained of did not contribute to the verdict obtained.” Jensen II, 794 N.W.2d at 504.
The Wisconsin Court of Appeals recognized that “[t]his ease was not a classic whodunit.” Id. at 493. Instead, the jury was asked to choose between two dark and premeditated alternatives — either Jensen murdered Julie and framed it to look like suicide, or Julie committed suicide and framed Jensen for murder. One unique aspect of this case is that each of Julie’s testimonial statements, as well as much of the duplicative admissible. evidence, could be interpreted to support either alternative. (Given the wealth of duplicative admissible evidence, it seems safe to assume the jury will be presented with the same stark choice if there is a retrial.) It reasonably could be said that the inclusion or exclusion of Julie’s letter and testimonial statements to Officer Kosman would not significantly alter the jury’s choice or the considerations underlying that choice, no matter the rhetoric employed by the State’s lawyers in pretrial filings or the parties’ use of the letter as a framing device during trial.
In part because so much of the evidence could be viewed as supporting either of the two competing theories, the prosecution’s case was not a slam dunk, as discussed by the majority. And as also noted by the majority, there might be reason to believe that Julie’s letter was especially forceful evidence (even though its authenticity was questioned) and that members of the jury would have given less weight to Julie’s oft-repeated fears and accusations if all they had were her oral statements to her neighbor, her son’s teacher, and Jensen’s sister, as well as the corroborating computer and medical evidence, evidence of Jensen’s incriminating statements and motive, and evidence of Julie’s lack of suicidal intent and devotion to her children. But it might also be reasonable to think that without the letter and testimonial statements to Officer Kosman, the jury would have been less inclined to believe Jensen’s theory that Julie committed suicide and framed him for murder, because anyone concocting such a scheme likely would have memorialized their accusations in writing and taken steps to ensure they came to the attention of the police. In other words, in this unique situation- — -where the evidence at issue supported each side’s theory — the state court could reasonably decide that despite the significant role Julie’s testimonial statements played in the trial, those statements did not play a significant role in deciding the jury’s verdict.
The majority faults the Wisconsin Court of Appeals for ignoring evidence supporting the defense theory., It is worth pointing out that the Wisconsin court stated that it “review[ed] the extensive record.” Jensen II, 794 N.W.2d at 504. But “of greater moment is the' Supreme Court’s ruling in Harrington [i>. Richter ] that even a state court ‘opinion’ consisting of the single word ‘affirmed’ is entitled to the full deference that the habeas corpus statute demands be given determinations by state courts. The Supreme Court’s ruling precludes our inferring error from the Wisconsin court’s failure to discuss particular pieces of evidence.” Price v. Thurmer, 637 F.3d 831, 839 (7th Cir.2011) (citing Richter, 562 U.S. at 98-99, 131 S.Ct. 770).
The majority reads the Wisconsin Court of Appeals’s decision as employing a sufficiency-of-the-evidence test, rather than a harmlessness test. If that was true, it would be an unreasonable application of Chapman, and to be fair, there are a few statements in the state court’s opinion to support this reading. But in each case, the court reiterated its finding of harm *912 lessness based on “the staggering weight of the untainted evidence and cumulatively sound evidence presented by the State.” Jensen II, 794 N.W.2d at 504. For example, -after cataloging some of the state’s corroborating evidence, the court stated:
With the above illustrative summary of the other, untainted and undisputed gripping evidence against Jensen — from which a rational jury could alone conclude beyond a reasonable doubt that Jensen cruelly planned and plotted and, in fact, carried out the murder of his wife Julie — we move on to examine the admitted testimonial evidence for a determination as to whether the assumed error in admitting it was harmless or reversible. As already noted, we conclude that the State has met its burden of proving admission of the testimonial evidence was harmless beyond a reasonable doubt. The State deftly dissects ' the challenged testimonial evidence and is able to point to admissible duplicative and corroborative evidence in the record.
Id. at 494-95 (emphasis added). This passage makes clear that while the Wisconsin Court of Appeals found the nontestimonial evidence against Jensen sufficient to support the jury’s verdict, this was not the basis of its harmlessness finding. Instead, the court “move[d] on” to conclude that the admission of Julie’s testimonial statements was harmless because the statements were duplicative of other, untainted corroborative evidence. Cf. Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (“Whether such an error is harmless in a particular case depends upon a host of factors.... These factors include ... whether the testimony was cumulative, [and] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points.... ”). As the Wisconsin court stated in concluding its harmlessness analysis, “[t]he sine qua non is that the testimonial statements provided nothing significant beyond the properly admitted nontestimonial statements.” Jensen II, 794 N.W.2d at 499. And as the court reiterated in concluding its opinion: “the State has proven beyond a reasonable doubt that any error complained of did not contribute to the verdict obtained.” Id. at 504; cf. Chapman, 386 U.S. at 24, 87 S.Ct. 824 (“[B]efore a federal constitutional error can be held harmless [on direct appeal], the court must be able to declare a belief that it was harmless beyond a reasonable doubt.”).
The Wisconsin Court of Appeals concluded that “even assuming the testimonial evidence of Julie’s letter and Julie’s statements to Kosman were inadmissible under the rules of evidence and the Sixth Amendment Confrontation Clause, we deem any error in admission harmless.” Jensen II, 794 N.W.2d at 499. Based on the duplicative nature of Julie’s testimonial statements and the overall strength of the prosecution’s case (even considering the defense evidence discussed by the majority), I am not convinced that the state court’s decision “ ‘was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.’ ” Ayala, 135 S.Ct. at 2199 (quoting Richter, 562 U.S. at 103, 131 S.Ct. 770); cf. id. at 2198 (“There must be more than a ‘reasonable possibility’ that the error was harmful. The Brecht standard reflects the view that a ‘State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.’ ”) (quoting Brecht, 507 U.S. at 637, 113 S.Ct. 1710; Calderon v. Coleman, 525 U.S. 141, 146, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998)). I would find that the decision of the Wisconsin Court of Appeals represented a reasonable application of control *913 ling precedent. Accordingly, I would reverse the grant of habeas relief.