**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3208
_____

WILLIAM JOHNSON,
                              Appellant

v.

MARIROSA LAMAS;
THE DISTRICT ATTORNEY OF THE
COUNTY OF PHILADELPHIA;
THE ATTORNEY GENERAL OF THE STATE
OF PENNSYLVANIA

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No.: 2-12-cv-05156)
District Judge: Honorable Anita B. Brody

_____

Argued February 8, 2016

_____

Before:  FUENTES[*], KRAUSE, and RENDELL,
<u>Circuit Judges.</u>

(Opinion Filed: March 3, 2017)

David Rudovsky   [ARGUED]
Kairys, Rudovsky, Messing & Feinberg
718 Arch Street
Suite 501 South
Philadelphia, PA 19106
                    *Counsel for Appellant*

Catherine B. Kiefer          [ARGUED]
Assistant District Attorney
Susan E. Affronti
Chief, Federal Litigation Unit
Ronald Eisenberg
Deputy District Attorney, Law Division
Edward F. McCann, Jr.
First Assistant District Attorney
R. Seth Williams
District Attorney
Max C. Kaufman
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA 19107
                    *Counsel for Appellees*

---

[*] Judge Fuentes assumed Senior Status on July 18, 2016 after
the appeal was argued.

## OPINION

RENDELL, *Circuit Judge*:

In the early morning hours of August 26, 2005, off-duty police officer Terrence Flomo was shot to death while he sat in his car near the intersection of 20th Street and Cecil B. Moore Avenue in North Philadelphia. The Commonwealth charged William Johnson and Mumin Slaughter with murder based on witness identifications and forensic testimony. The shooting occurred after Flomo had stopped his car and solicited Brenda Bowens, a prostitute and Slaughter's and Johnson's long-time drug customer.

At trial, the jury acquitted both defendants of first-degree murder, but convicted Slaughter on third-degree murder and criminal conspiracy. It failed to reach a verdict on any remaining charges as to Johnson.

At Johnson's retrial, the prosecution introduced a statement that Slaughter had given police that implicated Johnson. Everyone agrees that this violated Johnson's right to confront witnesses against him, and Johnson now argues that the error caused him prejudice warranting habeas relief. Separately, Johnson urges that the prosecutor's calling Slaughter to testify knowing that Slaughter would invoke his Fifth Amendment privilege denied him of due process. For the reasons that follow, we will affirm the District Court's denial of Johnson's habeas petition.

3

# I. BACKGROUND

Johnson's second trial began on May 28, 2009 and lasted four days. The Commonwealth's witnesses included Dr. Lieberman, the medical examiner, who testified that Flomo was shot in his right elbow and wrist area, as well as his chest. He opined that the gunshot to the chest caused significant damage to his liver, right lower lung, heart, and left lung, and as such was the "more immediately fatal of all three gunshot wounds." R.579.[1] Lieberman also testified that the muzzle of the gun was fired from two-and-one-half to three feet from Flomo. He opined that the entries were on the right side of his body, "including the shot that actually kill[ed] him, the one to his heart, the most immediately fatal one." R.595. Given the scenario of Flomo's sitting in the driver's seat of the car, Lieberman testified that the shots could only have come from the front passenger's side of the vehicle.

Further, a firearms expert testified that two particles of unburnt gunshot residue were recovered from the front passenger's side armrest, indicating that the gun was within three feet of the passenger's side window.

There was no physical evidence, however, linking Johnson to the crime scene. The Commonwealth offered two eyewitnesses, Brenda Bowens and Nora Williams, each of whom implicated Slaughter and Johnson and identified Johnson as the passenger's side shooter. The Commonwealth

---

[1] Citations to the record, unless otherwise indicated, refer to the PDF page number of Part 4 of Johnson's state court record per the ECF docket entry dated April 21, 2015.

also put Slaughter on the stand and, when he refused to testify, introduced the statement he gave to police implicating Johnson. Because Slaughter's statement was admitted erroneously, and the remaining two identifications are central to our analysis as to harmless error, we recount their testimony in some detail.

### A. Brenda Bowens

To support her crack addiction, Bowens worked as a prostitute in the area of 20th Street and Cecil B. Moore Avenue. Slaughter, whom she knew as "Muk," and Johnson, whom she knew as "Juice," were her drug dealers. R.647. She testified that she had known Johnson for "five, six years," and Slaughter for "ten, twelve." R.647. In fact, she "would see them every day" because she "always bought crack from them." R.647–48.

On the morning of the murder, Bowens reported being solicited by a man near the intersection of 20th and Cecil B. Moore. She declined because she intended to go into a nearby house to get high.[2] She crossed the street and reported the encounter to Slaughter and Johnson, who were walking up

---

[2] At least two houses on the street functioned as crack houses, including the house in which Bowens testified she intended to get high. There was some indication that Johnson and Slaughter sold drugs from these houses also, and that Bowens and Williams, as well as others, would buy their drugs from there. We note that while defense counsel objected to some of these questions concerning the nature of those houses, other testimony regarding the houses was admitted into evidence.

Cecil B. Moore Avenue. Bowens then continued to an all-night convenience store around the corner. Upon her return shortly after, she saw the same car that had solicited her before. As she approached the house, she "turned around" and "[saw] Muk and Juice. Muk's standing on the driver's side; Juice was on the other side, the passenger['s] side." R.632. She testified that Johnson was "leaning in the car." R.689. She stated:

> I didn't "see" it happen, but I saw flashes and I heard a gunshot, and immediately I ran, because that's what I do. When you see two neighborhood drug dealing guys, you run, because, you know. I don't have to go into detail. But I ran and started banging on the door, [saying] "Let me the hell in."

R.633. While banging on the door to be let in, she "glanced" behind her to "make sure that [she] was . . . out of harm's way." R.633. She then "heard another shot" and saw the "flash again." R.633. She testified that Johnson, at that point, was still standing at the passenger's side door. She then finally was able to enter the house.

At trial, the prosecutor reviewed the entire episode using a demonstrative map of the intersection. Bowens identified the house she intended to smoke in as well as where other events occurred. Bowens also addressed her failure to come forward to the police initially:

> Q. . . . When you went the second time to Homicide, after they're talking to you and you

6

told them what you saw, what caused you to tell them that you saw this? What happened?

. . .

A. I was saying that my family was real concerned that I was in danger, someone was going to kill me and that I needed help.

R.643–44.

On cross-examination, Bowens was impeached with her "severe drug habit," R.655, and criminal history. Bowens admitted to a prior conviction (for which she was sentenced to eleven-and-a-half to twenty-three months in jail), to being on probation, and to having a bench warrant out for her arrest when she gave her statement. She was also impeached with her failure to report what she saw to the police and her initial refusal to give a statement after she was picked up for questioning. Bowens disclosed that, during these interrogations, she was "promised" that she would be given help with her drug addiction.[3] R.663.

Bowens's perception of the shooting was also impeached. While Bowens reported seeing Johnson leaning into Flomo's car, she did not see anything in his hands. Bowens admitted that she only glanced in the direction of the shooting for what defense counsel characterized as a "mini-second . . . a flash." R.687. Defense counsel also impeached her with her prior inconsistent statements about the exact location of Flomo's car in the intersection when the shooting occurred. Finally, the distance between the shooting and the

---

[3] This help came by way of a voluntary prosecution and commitment to a drug rehabilitation program.

crack house Bowens attempted to enter (and in the vicinity of which Bowens reportedly saw the shooting) was, defense counsel urged in his closing, approximately 600 feet.[4]

On re-direct, the prosecutor attempted to rehabilitate Bowens on a number of points. He reviewed Bowens's identification of Johnson again:

> Q. In terms of that car, and counsel has asked you where the car was back and forth. When you see the shooting, are you concentrating on where the car is?
> A. No, not at all.
> Q. What are you concentrating on?
> A. Me getting away.
> Q. And did you recognize the guys who did it?
> A. Yes
> Q. And who are they?
> A. Juice and Muk.
> Q. And is Juice here now?
> A. Yes, sir.
> . . .
> Q. Point to Juice.
> A. Right there (indicating)
> Q. No doubt in your mind it was them, right?
> . . .
> A. That's a hard question. It was so many years ago, and I done been through so much, sir. I'm

---

[4] At trial, the jury was presented with a map of the area. The prosecutor said during his closing that, "It's not 600 feet. Take the measurement. It's about 300 and something." R.1215.

really honestly going to say that I am not really sure. I'm really honestly going to say that I'm not really sure. I been through so fucking much. I been through so much.

Q. And I know you've been through – Brenda, listen to me –

[DEFENSE COUNSEL]: Your Honor, may we have a break at this point?

[PROSECUTOR]: Look at me. No.

[DEFENSE COUNSEL]: Excuse me. I'm asking the Court.

THE COURT: No. Well, let me see. Are you all right? You all right?

*(Witness crying.)*

[DEFENSE COUNSEL]: Your Honor, perhaps we should take a break.

THE COURT: We're going to take a break.

R.727–29.

After a brief recess, Bowens testified that she was "very tired," and agreed with the prosecutor that she was "emotionally drained" and "want[ed] to get this over with." R.731. She continued, however, and testified again that Slaughter and Johnson stood next to Flomo's car:

Q. Okay. Now, I'm going to ask you this: That morning when you were out there and you hear the shot, what do you see?
. . .
[A.] That morning when I was out there, I see Juice and Muk standing at the car.

9

. . .

Q. You sure of that?

A. Am I positive, a hundred percent positive? I just said I wasn't. You asked me did I have any doubt, and I just said it. I was just – I mean, I'm emotionally drained. You all asking me the same thing over and over and over again.

Q. When you made the statement to homicide, did you tell them the truth?

. . .

[A.] Yes.

. . .

Q. When you went to the preliminary hearing – remember it was just a judge, no jury, and I was there and asked you questions – did you tell that judge the truth?

A. Yes.

Q. When you were here in 2007 before that judge and another jury, did you tell this judge the truth?

THE COURT: I was the Judge.

THE WITNESS: Yes.

BY [THE PROSECUTOR]:

Q. Are you telling us the truth now?

A. Yes.

R.732–34. The prosecutor then read portions of Bowens's prior consistent statements to the jury, which confirmed the essential details of her eyewitness account, including that Johnson stood on the passenger's side of Flomo's car.[5]

---

[5] Specifically, in her statement to the police, Bowens stated, "Juice was standing at the passenger side." R.737. The

10

prosecutor read other portions of Bowens's statements which also confirmed her testimony, including the following:

> Q. First page. The fourth Q, and I'll read the question, okay? Tell me if you're reading along with me. "Can you go on in your own words and tell us what you know about the shooting." Do you see that? I'm going to read your answer. "I heard one shot. I looked toward C.B. Moore Avenue. I saw the car stopped. Muk was standing on the driver's side . . . of the car in the street. Juice was standing at the passenger side. I seen two flashes go off inside the car. I couldn't see who was shooting. Then I saw Muk run away from the car towards the sidewalk. That's when I ran inside the house. I didn't see which way Juice ran." Did you say that?
> A. Yes, Sir.
> Q. That's what happened?
> A. Yes, Sir.
> . . .
> Q. "Question: Had you spoken to Police Officer Flomo prior to him being shot?" Your answer: . . . "I didn't know he was a police officer until the next day. I was on the way to the store at 19th and C.B. Moore. . . . I was crossing the street at 20th and Cecil B. Moore. Crossing Cecil B. Moore, his car was stopped at the light on C.B. Moore facing 21st." "He said to me, 'Hi, baby, what's up? What you doing?' I didn't want to be bothered. I just said to him, 'Get the

11

Bowens also testified that she feared for her safety. She stated that she had to be "relocated" after giving her statement to the police.[6] R.649. The prosecutor also questioned whether persons in the courtroom might have threatened her:

> fuck out of here,' and kept walking. That's when I seen Muk and Juice on C.B. Moore, between 19th and 20th. I said to them, 'Yo, hi. What's up? That guy just tried picking me up.' They kept walking towards 20th Street. I kept walking to the store at 19th."
> That's what happened?
> A. Yes, Sir.
> . . .
> Q. "Question: How long have you known Muk and Juice?" "Answer: I've known Muk over ten years. I have known Juice about five years." True?
> A. Yes, Sir.
> Q. "Question: Do you know Muk or Juice to carry a gun?" "Answer: On occasion I see Muk with one. He wears a holster. It's a black holster. The gun was big with a brown handle. I never see Juice with one, but I know he has a bad temper. He kicks doors in and stuff like that." True?
> A. That's true.

R.736-40.

[6] Bowens violated the terms of this relocation by returning to the intersection to get high. This occasioned her voluntary prosecution and commitment to a rehabilitation program.

Q. You said you were worried or not comfortable about certain people in this room. Are you afraid of the defendant's people and his family that are sitting in this room right now?

A. I'm afraid of everything right now, you know. I'm afraid of everything right now. I'm very – yeah, very afraid of everything. Not only them, but everybody. It's like everybody out to get me. When this shit went down, everybody was out to get me.

. . .

> THE COURT: . . . You want to get off the stand; Is that correct?
>
> THE WITNESS: Yes. I have a life. I'm just tired of being badgered. It's been five, four years I've been being badgered, badgered, badgered. The DA been badgering me, other people badgering me, everybody badgering me.

R.748–50. She was then briefly recrossed and redirected[7] before being excused.[8]

---

[7] On this final redirect examination, she broke down in tears again:

> Q. Brenda, your life is at stake right now, right?
> A. (No response.)
> Q. Right? Yes or no.
> A. My life is at stake, ever since this stuff went down, ever since my name and my face was on the news and all that happened. And it's left me hanging like that, you're damn right.

Q. And at the preliminary hearing, that lawyer was there every time.

A. Who?

Q. At the preliminary hearing when you first testified, you were sure of what you said, correct?

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: You can't keep bouncing me back and forth. I'm going crazy. I don't know nothing now.

THE COURT: No. Ma'am --

THE WITNESS: I don't know nothing now.

THE COURT: Ma'am --

THE WITNESS: I don't know nothing.

THE COURT: Ma'am, let me ask you a question.

THE WITNESS: I don't know nothing. Only thing I know is that I was on TV. Anybody can fucking kill me, anybody. Anybody could have killed me. I'm just happy to be alive. That's all.

*(Witness crying.)*

THE WITNESS: Anybody could have just killed me. Everybody left me hanging –

[DEFENSE COUNSEL]: Your Honor –

THE WITNESS: – the cops, everybody else left me fucking hanging.

14

## B. Nora Williams

The Commonwealth next called Nora Williams, who also placed Johnson at the passenger's side of Flomo's car during the shooting. Williams was also a prostitute who worked in the vicinity of 20th Street and Cecil B. Moore Avenue and who knew Bowens from having worked there.[9] Williams knew Johnson and Slaughter too and testified that she saw them every day on the block. Williams also purchased her drugs from them, sometimes several times a day.

On the morning of the murder, Williams had just finished with a customer when she saw Bowens across the

---

> THE COURT: All right. Please. Are you done, Mr. Vega?
> THE WITNESS: Put my face on TV and everything.
> [THE PROSECUTOR]: I'm going to be done. That's it.
> THE COURT: Very well. Ma'am, you're excused.
> *(Witness crying.)*

R.753-55.

[8] At the time of the second trial, Bowens had been sober for two and a half years and had two jobs.

[9] Their relationship, however, was acrimonious. Williams testified, "I really don't care too much about [Bowens]." R.774. Bowens, who testified to knowing Williams, said that she "didn't like her" either. R.656. At one time, both were in a "fist fight" with each other in the crack house on that block. R.657.

street "arguing" with a man in a car.[10] R.760. She then saw Bowens "walk away." R.761. She testified that Bowens "walked to [Slaughter and Johnson]" and "talked to them for a minute" before Bowens left the area. R.762–63. Then Williams saw "the car come back around" the block. R.764. When asked what happened next, she relayed the following:

> Q. When you see the car on 20th, what happens?
> A. That's when I seen Muk and Juice running towards the car.
> Q. Okay. When they run towards the car, do they get to the car?
> A. Yes.
> Q. And what happens?
> A. That's when I just heard – I seen them both had guns. I heard the guns start just shooting, pop, pop. And I couldn't really do nothing or move or nothing. There was nowhere to hide.
> Q. Okay. Now, I'm going to take you back a little. You said you see Muk and Juice coming towards the car, right?
> A. Uh-huh, yes.
> Q. Tell me, when Muk gets to the car, what side of the car does he go on?
> A. He's on the driver's side.

---

[10] On cross examination, Williams testified that she observed Bowens get into Flomo's car and argue with Flomo in the car itself. On redirect, however, Williams clarified that when she first observed Bowens, Bowens was standing near Flomo's car and therefore had only "assumed" Bowens was getting out of it. R.833.

Q. When you see Juice get to the car, what side does he get on?

A. He's on the passenger side.

Q. And in looking at them, are you facing the front of the car or the back of the car?

A. I'm like the front, yeah, the front of the car.

Q. Now, they're at the car. When they're getting to the car, do you see anything in their hands?

A. Guns.

Q. So we could be clear, does Muk have a gun in his hand?

A. Yes.

Q. Does Juice have a gun in his hand?

A. Yes.

. . .

Q. Okay. You said Muk's on the driver's side; Juice on the passenger. When they get up to the car, you said you saw the guns. What happens next?

A. Then I heard the firing, pow, pow, pow.

Q. Once the shooting stops, what does Muk do? What does Juice do?

A. They run off.

R.764–67; *see also* R.798 (testifying on cross examination that Johnson was on the "passenger side"). Williams reported being "right across the street," which was, in her estimation, approximately 20 feet from the shooting when it occurred. R.826.

Williams also initially declined to give a statement to the police, although she eventually did. Williams agreed with

17

the prosecutor that, after she gave her statement, "certain things happen[ed] to [her] in the neighborhood that caused the police department to relocate [her]." R.773. Williams also testified that she relayed the same testimony at the preliminary hearing and at the first trial.

Williams was impeached with her drug history. She admitted to having a 50-bag-a-day crack habit at the time of the murder, to having some cocaine in her system on the morning of the murder, and to possibly having cocaine in her system when she gave her statement to police. She was also questioned about her motivation in giving a statement to the police, including the fact that she had some "open cases"[11] and a "bench warrant on [her]" when she was interrogated. R.804. She also said that, at one of those interrogations, the police blamed her for the murder. Williams testified that she only "glance[d]" at the shooting, R.821, for what defense counsel characterized as a "mini-second," R.819. Finally, Williams did not agree with defense counsel's assertion that Johnson and Slaughter were "leaning into the car." R.819. Instead, she reported them to be a "foot, foot and a half" away.[12] R.822.

---

[11] Although defense counsel mentioned this criminal history, it was not explored in any detail.

[12] On redirect examination, the prosecutor spent some time attempting to establish just how far she thought the men were from the car. Apparently gesturing in the courtroom, the prosecutor asked her if "[Johnson] could touch [the car] if he wanted to," to which Williams responded, "Yes." R.834.

At the same time, Williams testified that there "[wasn't] any question in [her] mind" about what she saw.[13] R.801.

## C. Mumin Slaughter

The prosecution's last witness was Mumin Slaughter, Johnson's convicted co-defendant. Slaughter had given a statement to police implicating Johnson, and based on this cooperation and his anticipated testimony at Johnson's re-trial, his sentence had been vacated. However, at trial, he essentially refused to testify. The jury was then read portions of his statement over defense counsel's objection and Slaughter's repudiation of the statement itself. Because Johnson argues that the introduction of this statement violated his rights and substantially influenced the verdict, we recount not only the statement itself, but also the context within which it was introduced.

Just before Slaughter was to testify, counsel appeared in the judge's robing room, which was out of earshot of the jury. The prosecutor informed the trial judge that Slaughter was refusing to come upstairs to testify despite being subpoenaed. The trial judge stated that Slaughter had no Fifth Amendment privilege and the prosecutor agreed.[14] Slaughter was then brought into the courtroom and called to the witness stand.

---

[13] At the time of the second trial, Williams had been clean for two years, except for occasional marijuana use.

[14] The trial court admitted later that this was error. App. 19 n.8. Because Slaughter's sentence had been vacated, he was still entitled to exercise his privilege. *Id.*

Slaughter answered a few questions, confirming, for example, that he had been convicted of murder in the first trial, that his sentence had been vacated, and that he had spoken to the prosecutor that day and understood he would be held in contempt if he refused to testify. But he denied making the statement to police that implicated Johnson. When the prosecutor began to press Slaughter on that issue, he became uncooperative:

> Q. . . . Did you make a statement?
> A. No.
> Q. Did you, on August 26, 2005, in that period of time, did you sell drugs?
>> THE WITNESS: Your Honor, I don't know why I'm sitting here. I don't have nothing to say.
>> THE COURT: You've been called as a witness, Mr. Slaughter.
>> THE WITNESS: Well, I did not witness anything.
>> THE COURT: Well, you've been called as a witness because your sentence was vacated, and I was the sentencing judge who gave you 25 to 50 years.
>> . . .
>> And we're here now. And [the prosecutor] is going to ask you some questions.
>> THE WITNESS: I have nothing to say, Your Honor.
> BY [THE PROSECUTOR]:
> Q. Good. Well, listen to me a little while longer.

20

> [DEFENSE COUNSEL]: Objection, Your Honor.
>
> THE COURT: No. Overruled. It's not your – you don't represent him.
>
> BY [THE PROSECUTOR]:
>
> Q. Sir, did you serve a federal sentence?
>
> A. I plead the fifth. I don't have nothing to say.
>
> THE COURT: You don't have a Fifth Amendment privilege.
>
> THE WITNESS: Well, I'm just going to sit here with nothing to say, because you all can't force me to do anything.

R.847–48. At sidebar, counsel eventually agreed to attempt to contact Slaughter's attorney and court recessed for the weekend.

On Monday, counsel convened in the robing room outside the presence of the jury. Slaughter's trial attorney appeared in court and explained Slaughter's state of mind:

> Now that he's realized – he says that he's being asked to testify, he said he doesn't want to do that. He says he doesn't want to share the bad fortune that has descended on him in this case, having been improperly convicted, on somebody else. . . .
>
> He talked about [how] he thought he was misle[d] by the District Attorney's office in some fashion and reiterated that he didn't want to bring any – any harm to Mr. Johnson, and at one point said that he really had no knowledge

21

of, you know, who, in fact, killed the officer in this case.

R.862–63. The Court agreed with the Commonwealth, however, that Slaughter should be brought out again and held in contempt or resentenced if he refused to testify. The jury then returned to the courtroom. The prosecutor resumed his questioning, over defense counsel's objection. Slaughter admitted to speaking to the prosecutor and his lawyer but answered little else.

The Court then interrupted Johnson's trial to resentence Slaughter. The jury was escorted from the courtroom again, as was Johnson, and Slaughter was seated in the defendant's chair. A separate "sentencing hearing" was then conducted and recorded in a separate transcript under a different case number. *See* R.404–24. Ultimately, no new sentence was imposed; instead the parties probed Slaughter's unwillingness to testify further. Slaughter testified:

> THE DEFENDANT: [Slaughter] . . . So I put a freaking statement together to try to help myself, to make him not go to trial. Now he want me to come up here and say he did do all this.
> THE COURT: Well, quite frankly, all you have to do is say you gave a statement and answer his questions.
> THE DEFENDANT: But if I do that, it's going to make his trial look bad. The thing – he said he could help us get deals, just to help me. Now he want me to go up there and say all this. It's going to mess up the trial and make him look

22

like a murderer. Nobody don't believe us anyway that we didn't do it. But being though I got 50 years, I wanted to help myself and make it back to my kids.

Now he want me to sit here and say he did do this. I'm not willing to do that, because that's going to make me a liar and that's going to make me look bad, and I'm going to have that on my conscience.

R.409. The prosecutor then recommended that given "this defendant's attitude and not showing any type of remorse and, in fact, trying to undermine the truth-seeking process of the Commonwealth trying to bring some justice," Slaughter should be resentenced in line with his original sentence. R.414. The transcript then ended at this point and Johnson's trial resumed.[15]

The jury was brought out and the prosecutor resumed his questioning. After Slaughter remained essentially silent, the prosecutor presented Slaughter with his statement and, over Johnson's attorney's objections,[16] the Court permitted

---

[15] The prosecutor indicated that if Slaughter continued to refuse to testify he would go "line by line" over Slaughter's statement. R.411. The prosecutor's apparent strategy was to use the testimony from the "sentencing hearing" to establish that Slaughter adopted the statement.

[16] The trial court denied defense counsel's motion for a mistrial. Defense counsel had earlier indicated that he would make a motion for a mistrial on the grounds that Slaughter's refusal to testify prevented him from cross examining

the prosecutor to put Slaughter's statement on the overhead projector screen so that the jury could see it. Slaughter initially denied making the statement to police. He called the prosecutor a "liar," a "sneak," and "vicious." R.895. After being asked if he had said, at the earlier "sentencing hearing," that he had "put a freaking statement together," R.898, Slaughter interjected in front of the jury:

> THE WITNESS: Listen, I got found guilty for a fucking murder that nobody don't know who killed this man. They gave me 50 years and nobody said I did nothing. They trying to railroad us. They gave me 50 years. My own lawyer, even him told me I can never get back in court to get back to my kids or nothing. They said just say that you all did it and he won't want to go to trial. You can get your 50 years back and he'll take a statement – I mean, he'll take a deal. He won't want to go nowhere, because he be scared if I come out there with all these other liars saying that we did something.
>
> I didn't have no choice. I didn't know what to do. I was scared. A desperate man do desperate things. I tried it. Now, he didn't go for it. He didn't take it because he know me. He know that I was lying. He knew that I wouldn't do this, because it was a lie.
> …
> Q. Does that mean he's your friend?

---

Slaughter, and thus that Johnson's "right . . . to confrontation of a witness has now been destroyed." R.881.

24

A. This is bullshit. You lie. You lie.
Q. Answer the question. Is he your friend?
A. This is bullshit.
Q. Is he your friend?
A. You trying to come in here and make like I really said he did this.

R.899–900. Defense counsel then asked Slaughter a number of questions, most of which went unanswered, and finally, Slaughter was excused.

The prosecutor subsequently called a detective who read Slaughter's statement, line by line, to the jury. In the written statement, Slaughter indicated that he went by the nickname "Muk" and that he knew Johnson as "Juice;" that on the night of the murder he was on the corner of 20th and C.B. Moore selling crack; that Bowens had approached them to report the attempted solicitation by Flomo; that, when the car pulled up, "Juice pulled out his gun and started firing at the guy through the passenger side;" and that they both then ran off in different directions. R.922–24.

Finally, at the close of the Commonwealth's case, the prosecutor called the court reporter, who then read Slaughter's earlier sentencing hearing transcript in its entirety to the jury. The Commonwealth then rested.

Johnson presented only one witness, Deborah Bryant, who also testified in the first trial. Her testimony was read in by stipulation because she was unavailable. Although Bryant denied knowing anything about the murder at the time of the first trial, defense counsel impeached her at the first trial by reading portions of a statement, given to police at an earlier

25

time, claiming that two men by the name of "Peanut" and "Jeff" shot Flomo. R.1113.

The jury was then instructed and retired to deliberate. During deliberations, the jury sent out two notes, to which the judge responded by sending back some of the evidence and giving them further instructions on the law.[17] The jury then

[17] The jury first requested that certain evidence be sent back to the jury room including crime scene photographs, the demonstrative map of the intersection, and Slaughter's written statement. The trial judge, however, did not permit the statement to be given to the jury and the jury did not ask for it again.

Later in the day, the jury sent out another note containing two questions. Before responding, the judge re-charged the jury on third degree murder. The judge then said:

> Question No. 1: "Can the defendant be convicted of murder parenthesis in the third degree even if we don't believe he is the shooter?" If you have been convinced beyond a reasonable doubt that the defendant is part of a conspiracy or is an accomplice, the answer to that question is, yes, he can be convicted of murder in the third degree even if you don't believe he is the shooter.

R.1292. The Judge had earlier instructed the jury on the definition of an accomplice. The judge continued:

> The second question is: "If we can't agree on one of the charges, does that equal a hung jury

26

found Johnson guilty of third-degree murder and criminal conspiracy, and the Court sentenced Johnson to consecutive prison terms of 20 to 40 years and 10 to 20 years for the conspiracy.

## D. Post-trial Proceedings

The Pennsylvania Superior Court affirmed Johnson's conviction. *See Commonwealth. v. Johnson*, 29 A.3d 821 (Pa. Super. Ct. 2011). On direct appeal, Johnson raised three claims, two of which are relevant here. First, he argued that the introduction of Slaughter's statement violated his right to confront witnesses under the Sixth Amendment. The Superior Court recognized that the "contents of Slaughter's statement should not have been allowed in evidence because . . . their introduction violated [Johnson]'s right of confrontation," R. Part 1, at 11, but nonetheless found the error harmless. Second, Johnson argued that the prosecutor violated his Due Process Clause rights when he called Slaughter as a witness, knowing that Slaughter would refuse to testify. The Superior Court concluded that both parties and the trial court were under a mistaken assumption that Slaughter no longer had a Fifth Amendment privilege, but that its introduction was not a Due Process Clause violation. It reasoned that calling

---

for all the charges?" No, it does not. The charges are individual.

R.1292. The jurors resumed deliberations and, twenty minutes later, returned a verdict of guilty against Johnson on both counts.

27

Slaughter was "not an improper attempt by the Commonwealth to create an inference of guilt by association between Johnson and Slaughter." R. Part 1, at 17. The Pennsylvania Supreme Court then denied Johnson's petition for allowance of appeal. *See Commonwealth v. Johnson*, 46 A.3d 716 (Pa. 2012).

Johnson filed a counseled petition for federal habeas corpus relief and raised three habeas claims: "(1) denial of due process by the prosecution's deliberate elicitation of his co-defendant's assertion of the Fifth Amendment before the jury, (2) denial of [his] Sixth Amendment right to confrontation of witnesses, and (3) denial of due process by introduction of evidence falsely implying that Johnson threatened a witness." *Johnson v. Lamas*, Civ. Action No. 12-5156, 2013 WL 8744692, at *3 (E.D. Pa. Dec. 18, 2013). The Magistrate Judge issued a Report and Recommendation that habeas relief be denied on all three claims. Although the Magistrate Judge concluded that "federal courts do not owe deference to the state court's harmless error conclusion," the Magistrate Judge found that the evidence against Johnson "was strong enough, even apart from the evidence admitted in violation of [the Confrontation Clause], that the error did not cause actual prejudice." *Id.* at *16.

The District Court adopted the Magistrate Judge's Report and Recommendation, and issued a certificate of appealability as to Johnson's Confrontation Clause claim. *Johnson v. Lamas*, Civ. Action No. 12-5156, 2014 WL 3035671, at *1 (E.D. Pa. July 1, 2014). We subsequently granted Johnson's motion to expand the certificate of appealability to include the issue of "whether the District Court erred in denying Johnson's claim that his due process

28

rights were violated when the Commonwealth called and examined a witness who invoked his Fifth Amendment privilege against self-incrimination." Order, dated May 4, 2015. We now turn to these two questions.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over the habeas corpus petition pursuant to 28 U.S.C. § 2254, and we have jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 2253. Since the District Court did not hold an evidentiary hearing, our review over the District Court's denial of Johnson's habeas petition is plenary. *See Thomas v. Horn*, 570 F.3d 105, 113 (3d Cir. 2009). At the same time, the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. §§ 2254(d), 2254(e), requires that we "afford considerable deference to state courts' legal and factual determinations," *Palmer v. Hendricks*, 592 F.3d 386, 391–92 (3d Cir. 2010) (internal quotation marks omitted).

## III. CONFRONTATION CLAUSE CLAIM

The introduction of Slaughter's statement identifying Johnson as being the passenger's side shooter after Slaughter refused to submit to cross-examination violated Johnson's Sixth Amendment right to confront witnesses against him. This much the Commonwealth concedes. Therefore, the only question we must decide is whether this error was harmless. For the reasons that follow, we find that it was.

29

## A. Harmless Error Standard

To be entitled to habeas relief, a habeas petitioner must establish that the trial error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under this test, we may grant relief only if we have a "grave doubt" as to whether the error at trial had a substantial and injurious effect or influence. *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). In other words, "[t]here must be more than a 'reasonable probability' that the error was harmful." *Id.* (quoting *Brecht*, 507 U.S. at 637).

Several factors guide our review of Confrontation Clause errors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

The Supreme Court has recently discussed the framework we must apply when a habeas petitioner claims that a state court erred in finding that a constitutional error was harmless. In *Davis* v. *Ayala*, the Court confirmed that the *Brecht* standard still governs our harmless error analysis on collateral review.[18] 135 S. Ct. at 2198 ("[Petitioner] must

---

[18] *Davis v. Ayala* was decided during the pendency of this appeal. We requested and received letter briefs from both

30

meet the *Brecht* standard . . . .”). However, where a state court has concluded that the error was harmless on direct review, the Supreme Court clarified that we must defer to that determination under AEDPA unless the state court unreasonably applied *Chapman v. California*.[19] *See id.* at 2198–99 (noting that where the state court decides harmlessness, AEDPA’s “highly deferential standards kick in”). Although the Supreme Court had previously held in *Fry v. Pliler* that *Brecht* “subsumes” AEDPA’s deference requirement, “[t]he *Fry* Court did not hold—and would have had no possible basis for holding—that *Brecht* somehow abrogate[d] the limitation on federal habeas relief that § 2254(d) plainly sets out.” *Id.* at 2198 (quoting *Fry v. Pliler*, 551 U.S. 112, 119–20 (2007)). Therefore, while *Brecht* “subsumes” AEDPA’s requirement such that we need not “‘formal[ly]’ apply both *Brecht* and ‘AEDPA/*Chapman*,’”

---

parties addressing the “significance of [*Ayala*] for our harmless error analysis in this case, including but not limited to what consideration is due the state court’s harmless error analysis in view of *Fry v. Pliler*, 551 U.S. 112 (2007), *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003), and *Brecht v. Abrahamson*, 507 U.S. 619 (1993).” Letter to Counsel, dated Jan. 21, 2016.

[19] *Chapman*, which applies to the review of constitutional errors on direct review, requires that the state prove that a particular constitutional error is “harmless beyond a reasonable doubt.” *Chapman v. California*, 386 U.S. 18, 24 (1967). Conversely, in recognition of the concerns of finality, comity, and federalism, *Brecht* shifts the burden on collateral review to the petitioner to demonstrate that the error had a “substantial and injurious effect . . . on the verdict.” *Ayala*, 135 S. Ct. at 2198 (quoting *O’Neal*, 513 U.S. at 436).

AEDPA § 2254(d) nevertheless "sets forth a *precondition* to the grant of habeas relief." *Id.* (alteration in original) (emphasis added) (quoting *Fry*, 551 U.S. at 119–20).[20]

Under AEDPA, an application for habeas relief shall not be granted for any claim adjudicated "on the merits" in state court unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. 2254(d)(1). A harmlessness determination constitutes an adjudication on the merits. *See Ayala*, 135 S. Ct. at 2198 (holding that California supreme court harmlessness decision "undoubtedly constitute[d] an adjudication . . . 'on the merits'"); *Mitchell v. Esparza*, 540 U.S. 12, 17–18 (2003). Consequently, a "federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." *Ayala*, 135 S. Ct. at 2199 (quoting *Fry*, 551 U.S. at 119). "And a state-court decision is not unreasonable if 'fair-minded jurists could disagree on [its] correctness.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). Thus, a habeas petitioner must show that the state court's harmless error determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[21] *Id.* (quoting *Harrington*, 562 U.S. at 103).

---

[20] We therefore reject Johnson's argument that "Ayala ha[d] no impact on this case," Johnson Letter Br. 2, because *Ayala* did provide clarification that AEDPA is a "precondition" to any habeas relief, 135 S. Ct. at 2199.

[21] Johnson urges that "given the manner in which the Superior Court addressed the issues, no deference is owed

In sum, we must ask whether a fair-minded jurist could agree with the Superior Court's conclusion that the introduction of Slaughter's statement was harmless. If we find that she could, then Johnson "necessarily cannot satisfy" *Brecht* and we must give AEDPA deference to the Superior Court's determination, even if we might decide the case differently were we to undertake *de novo* review. *Ayala*, 135 S. Ct. at 2199.

## B. Application

Here, the Superior Court concluded that the introduction of Slaughter's statement was harmless because it "was merely cumulative of the testimony provided by Bowens and Williams." R. Part 1, at 16. In so holding, it recounted Bowens's and Williams's identifications, *id.* at 12–15, their impeachment, *id.* at 14, and some of the factors that rehabilitated their credibility, including that both eyewitnesses had known Johnson for years, that both

under § 2254." Johnson Letter Br. 2. We disagree. Although the Superior Court did not cite *Chapman* or *Van Arsdall* explicitly, it specifically considered whether the admission "prejudice[d] the defendant" and "could not have influenced the outcome of the case." R. Part 1, at 11 (citing *Commonwealth v. Jones*, 668 A.2d 491, 506 (Pa. 1995)). As the Supreme Court has repeatedly said, AEDPA "does not require citation of [the Supreme Court's] cases [nor] . . . even . . . awareness" of them, "so long as neither the reasoning nor the result . . . contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). The Superior Court's opinion is consistent with *Chapman*.

33

provided consistent identifications at the preliminary hearings, and were "unwavering in their identifications" during "vigorous cross-examination," *id.* at 15–16; 15 n.8. Although the District Court did not analyze whether it owed deference to this conclusion, it nonetheless concluded that the error was harmless under *Brecht*.

Applying the relevant standard, we find that a reasonable jurist could conclude that the cumulative nature of Slaughter's identification rendered its erroneous introduction harmless. The Commonwealth presented two key witnesses, Bowens and Williams, whose identifications fundamentally corroborated each other on points critical to the Commonwealth's theory of the case. Williams corroborated that Bowens spoke to Johnson after being solicited by Flomo, a conversation that the Commonwealth theorized instigated the attack. Williams and Bowens, moreover, reported seeing the men standing near or leaning on the car before the shooting and, crucially, both saw Johnson standing at the *passenger's* side of the car when they saw and heard gun shots. This consistent placement of Johnson at the passenger's side of Flomo's car is of particular significance here in light of Dr. Lieberman's testimony that the "most immediately fatal" gunshot came from that location. Slaughter's statement, therefore, added very little, if any, new substance to their consistent narratives. In this sense, the Superior Court reasonably concluded that the written statement given by Slaughter was cumulative of Bowens's and Williams's testimony. *See Van Arsdall*, 475 U.S. at 684 (directing courts to consider, among a list of non-exhaustive factors, whether the erroneously admitted statement was "cumulative" of other evidence).

Johnson responds that Bowens's and Williams's testimony, apart from Slaughter's statement, left "serious doubt" as to Johnson's guilt because Bowens and Williams were significantly impeached. Johnson Br. 22. Johnson points to their criminal and drug histories, proffers motives that might have biased their testimony, and highlights deficiencies in their perception of the shooting itself, particularly that each only glanced for a "mini-second." Reply 12. We cannot say, however, after reviewing the whole record, that the Superior Court's harmlessness determination, which discounted the effect of this impeachment on the jury, was *objectively unreasonable* such that no fair-minded jurist could agree with it. To the contrary, a fair-minded jurist could find that the introduction of the statement did not have a substantial effect on the verdict.

We begin by noting that the jury heard rehabilitation testimony that bolstered Bowens's and Williams's credibility. It is true that Bowens—exhausted, and in tears—admitted to some doubt as to her identification. But despite this, Bowens affirmed on redirect that she had been telling the truth at this trial, at the previous trial, at the preliminary hearing, and when she gave her statement to the police. In fact, the jury actually heard several portions of these prior consistent identifications. And, unlike Bowens, Williams expressed no doubt whatsoever during cross-examination. Finally, as the Superior Court notes, Bowens and Williams had known Slaughter and Johnson for over five years, making it more likely that the jury could accept their identifications as accurate.[22]

---

[22] Indeed, Bowens and Williams were not simply casual passers-by of the murder scene. They were intimately

35

Bowens also responded specifically to charges of bias and fabrication by explaining that she overcame her earlier hesitancy to give a statement at the urging of her family, who believed she was in danger and needed help. Further, on redirect examination, Bowens repeatedly testified that she feared for her life and that she worried about reprisals. The jury also heard that Bowens and Williams needed to be relocated. In short, while "[these] reasons could easily be disbelieved," Johnson Br. 23, the jury, which observed both witnesses throughout their testimony, could have, by the same token, determined that both were in fact *more* credible given their willingness to testify in the face of these fears. In light of this rehabilitative testimony, we cannot say that the Superior Court's determination that Slaughter's statement was harmless "was so lacking in justification" that we should refuse to give it AEDPA deference. *Harrington*, 562 U.S. at 103.

Next, Johnson directs our attention to the circumstances surrounding the introduction of Slaughter's statement. Johnson argues that the prosecutor's attempt to introduce Slaughter's statement made it the "central focus" of the trial, and, as a convicted co-defendant, Slaughter's refusal

---

familiar with this block in North Philadelphia. Bowens and Williams knew each other and saw Johnson and Slaughter on a daily basis to buy drugs, which they often did immediately after turning a trick on the very same block. They knew the crack houses on that block and frequented them, and there were indications at trial that Johnson and Slaughter operated from those same houses. The jury could have considered this as well when assessing their credibility.

to testify on self-incrimination grounds amplified the statement's effect. Reply 11. The Commonwealth replies that Slaughter's testimony repudiating the statement in front of the jury undermined its impact. Although it is difficult to ascertain the exact effect this episode had on the verdict, we believe that certain aspects of Slaughter's statement may have lessened the effect of the statement. Slaughter not only denied in front of the jury that he committed the murder, but also explained that he gave the statement implicating Johnson in the belief that it would cause Johnson not to go to trial. So while the corroborative aspects of Slaughter's statement might have had some impact on the jury's verdict, we cannot be certain that it had as damaging an effect as we typically find when a nontestifying co-defendant's statement is admitted, unrepudiated and unchallenged.[23] *Cf. Adamson v. Cathel*, 633 F.3d 248, 259–61 (3d Cir. 2011); *Vazquez v. Wilson*, 550 F.3d 270, 283 (3d Cir. 2008). Similarly, while Confrontation Clause errors such as these present a risk of creating guilt by association, Slaughter blunted those inferences by denying Johnson's guilt and even his own. Taken together with Bowens's and Williams's consistent eyewitness testimony and the forensic evidence, Johnson has not shown "more than a 'reasonable possibility'" that the statement itself was harmful. *Ayala*, 135 S. Ct at 2198 (quoting *Brecht*, 507 U.S. at 637).

---

[23] We note that even the trial court, upon hearing Slaughter's adamant repudiation, wondered aloud to defense counsel in his robing room that defense counsel might actually want Slaughter's testimony to be admitted. *See* R.886.

Further, we do not agree with Johnson's argument that Slaughter's statement was the Commonwealth's only focus. Indeed, the prosecutor devoted roughly equivalent portions of his closing to reviewing Bowens's and Williams's testimony. As such, we are not persuaded that Slaughter's statement had a "*substantial* and injurious effect or influence" on the verdict, even when we consider the circumstances surrounding its introduction. *Brecht*, 507 U.S. at 637 (emphasis added).

Finally, we disagree with Johnson's argument that our prior *Brecht* harmless error cases compel a finding in his favor here. Johnson Br. 24 (citing, *inter alia*, *Adamson*). In *Adamson*, we concluded that a trial court's *Bruton* error of permitting presentation of an accomplice's inculpatory statements, without a limiting instruction, was not harmless under *Brecht.* 633 F.3d at 260. Johnson likens the evidence in his case to the evidence there, but they are not on all fours. In *Adamson*, the *only* evidence of the petitioner's guilt, aside from the erroneously admitted statements of his accomplices, was the petitioner's own confession, the validity of which he challenged extensively and credibly at trial. *Id.* at 261–62. Indeed, "[t]here were no eyewitness statements identifying [the petitioner] as taking part in the robbery . . . ." *Id.* at 261. Likewise, in *Washington v. Sec'y Pa. Dep't of Corrs.*, the "only significant evidence against Washington," aside from the statement admitted in violation of *Bruton*, was from a single co-conspirator who was not an eyewitness to the murders and who was impeached with "significant inconsistencies" in his story, in addition to his history of drug and alcohol abuse, "admitted heavy impairment from drugs" at the time of the murders, and his motivation to minimize his own role in the crime. 801 F.3d 160, 162, 171 (3d Cir. 2015).

Here, although they faced impeachment, there was not just one, but two eyewitnesses who were well-acquainted with Johnson and Slaughter and whose mutually corroborative testimony established that Johnson stood on the passenger's side of the car. *Cf. Bond v. Beard*, 539 F.3d 256, 276 (3d Cir. 2008) (holding the admission of nontestifying co-defendant's confession in violation of Sixth Amendment harmless where there was defendant's allegedly coerced confession *but also* an eyewitness who testified that he was "absolutely certain" that defendant committed the crime). Thus, we do not have the same "doubt" that the verdict was *substantially* influenced by the error as we did in *Adamson*.[24] 633 F.3d at 260.

---

[24] Johnson urges that the statement influenced the jury because the first trial ended in a hung jury as to Johnson, so its use in the second trial must have made a difference. We are not persuaded. As the District Court noted, a jury may hang for many reasons unrelated to the credibility of the eyewitness, including the "idiosyncratic views of a single juror." *United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004). Johnson's view that the only difference was Slaughter's statement fails to take into account some of the nuances in presentation and focus that differed between the trials as well as the "simpl[e]" fact that "different juries may view the same facts and testimony differently." *Barker v. Fleming*, 423 F.3d 1085, 1101 (9th Cir. 2005).

Moreover, as indicated by its question during deliberation and the trial court's subsequent charge, the second jury may well have found Johnson guilty of third-degree murder as an accomplice, even if they were not certain that he was the shooter. *See* R.1292; *supra* n.17.

39

In sum, we do not wish to diminish the importance of the right to confront witnesses, but because Slaughter's statement was cumulative of Bowens's and Williams's largely consistent identifications, the Pennsylvania Superior Court did not act unreasonably in concluding that the error was harmless. Therefore, we conclude that Johnson "necessarily cannot satisfy" the *Brecht* requirement of showing that he was "actually prejudiced" by the state court's error. *Ayala*, 135 S. Ct. at 2199. Accordingly, we will affirm the judgment of the District Court on this aspect of Johnson's appeal.

## IV. DUE PROCESS CLAIM

Johnson also claims "a separate violation" of his due process right occurred when the prosecutor successfully insisted that Slaughter take the stand with full knowledge that the witness would assert his Fifth Amendment right. Johnson Br. 12. The Superior Court rejected this claim on the merits, as did the Magistrate Judge in her Report and Recommendation which the District Court adopted. *Johnson*, Civ. Action No. 12-5156, 2013 WL 8744692, at *14 n.14 (noting that Johnson's arguments rely on portions of *Namet v. United States*, 373 U.S. 179 (1963), involving "merely dicta").

We do not need to determine whether we owe deference to the Superior Court's determination because we do not think the authorities Johnson relies upon clearly establish a due process violation. AEDPA permits habeas relief only where a state court unreasonably applies "clearly established federal law." 28 U.S.C. § 2254. "[C]learly

40

established federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 280 (3d Cir. 2016) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003)). Importantly, it only "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

Here, Johnson relies on *Namet v. United States*, in which the Supreme Court considered a claim that a prosecutor's questioning of two witnesses concerning their gambling relationship with the defendant with the knowledge that they would invoke their Fifth Amendment right constituted reversible error. 373 U.S. at 180. In that case, however, the Supreme Court rejected the defendant's argument of "evidentiary trial error," and only in *dicta* did it consider what type of showing might be necessary to state a *constitutional* claim on this theory. *Id.* at 185. The Supreme Court explicitly noted that "[n]o constitutional issues of any kind are presented." *Id.* Accordingly, *Namet* is "off the table" for habeas purposes. *Early*, 537 U.S. at 10 (holding that petitioner's authorities, which did not "purport[] to interpret any provision of the Constitution," could not provide clearly established federal law within the meaning of § 2254).[25]

---

[25] Johnson also relies on *Douglas v. Alabama*, 380 U.S. 415, 420 (1965) ("The circumstances are therefore such that 'inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.'" (quoting *Namet*, 373 U.S. at 187)). *Douglas*,

We note also that even if such a right were clearly established, there is considerable uncertainty in the factual record as to when—and to what extent— the prosecutor knew Slaughter would exercise his Fifth Amendment privilege. The prosecutor's foreshadowing of Slaughter's testimony in his opening statement does not necessarily indicate that the prosecutor knew Slaughter would invoke his right to not testify, as much as it indicates the prosecutor's awareness that Slaughter might attempt to distance himself from the statement. Moreover, other than the trial court's unprompted reference outside the presence of the jury, the first mention by Slaughter that he would invoke his Fifth Amendment right occurred while he was on the stand.

Accordingly, we will affirm the District Court's rejection of Johnson's "separate" due process claim as well.

## V. CONCLUSION

For the foregoing reasons, we will AFFIRM the District Court's order.

---

however, considered only a Confrontation Clause claim, and the cited language does not establish an *independent* due process claim. At most, *Douglas* supports Johnson's argument that we should consider Slaughter's refusal to testify when analyzing the prejudice that flowed from the Confrontation Clause violation, an analysis we undertake above. We have analyzed Johnson's other cited authorities and have similarly concluded that they do not clearly establish such a right as required under § 2254.

42