**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 14, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DOUGLAS ARLIE PUCKETT,

     Petitioner - Appellant,

v.

JOE M. ALLBAUGH,

     Respondent - Appellee.

No. 16-6349
(D.C. No. 5:14-CV-00301-W)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT***
_____

Before **TYMKOVICH**, Chief Judge, **BALDOCK** and **HOLMES**, Circuit Judges.
_____

    Douglas Arlie Puckett was convicted under Oklahoma law on numerous counts

of child sexual abuse. He was sentenced to thirty years' imprisonment and fined.

After his convictions and sentence were affirmed on direct appeal, he filed a

28 U.S.C. § 2254 petition for habeas corpus in federal district court. The district

court denied his petition and denied a certificate of appealability (COA). We granted

a COA on the sole issue he sought to appeal: whether the Oklahoma Court of

_____

    * After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Criminal Appeals (OCCA) reasonably applied federal law in finding harmless error where the trial court had excluded an allegedly inconsistent and exculpatory letter written by one of the victims.

Exercising jurisdiction under 28 U.S.C. § 2253(a), we affirm the district court's denial of the petition.

## I. BACKGROUND

### A. Trial court proceedings

The victim of the conduct underlying the convictions at issue in this appeal (two counts of forcible oral sodomy and two counts of attempted forcible oral sodomy) was J.N., the minor son of Puckett's live-in girlfriend, Michelle Novotny. When Puckett was charged in this case, J.N. was suffering from a malignant brain tumor. To preserve his testimony in the event he passed away before the case went to trial, J.N. testified at a preliminary hearing in mid-2009. J.N. died later in 2009, and a video recording of his testimony was played to the jury at Puckett's trial in 2011. Some factual background helps put the certified issue in context.

J.N. was born in 1998. When he was four, he began living in Puckett's house with Novotny, his sister, and Puckett. Between 2006 and 2008, three different investigators from the Oklahoma Department of Human Services (DHS) investigated reports of physical abuse in J.N.'s home. None of the investigators had received any allegations that J.N. had been sexually abused, and J.N. reported no sexual abuse to any of them.

2

In January 2009, J.N.'s father picked J.N. up for visitation and observed a bruise around his eye. J.N.'s father took him to the police station, where J.N. told the police that Puckett had physically abused him. Again, he did not mention sexual abuse. Based on J.N.'s report, the police took him into protective custody.

The police then took J.N. to a children's shelter, where J.N. told DHS child welfare specialist James Williamson that Puckett had physically abused him. He did not mention sexual abuse. J.N. also said he wanted to live with his father because Puckett was unkind, and he was eventually allowed to do so, at his paternal grandmother's house. He never again lived with his mother or Puckett.

J.N. testified that later that day at the children's shelter, he informed another DHS worker that Puckett had put his penis in J.N.'s mouth on two occasions and had touched J.N.'s penis on five occasions, and that the two instances of oral sodomy occurred when J.N. was five and six years old.

Ten days later, J.N. told Larry McAllister, a forensic interviewer at the Child Advocacy Center, that on five occasions Puckett had touched his penis on the skin, called it "playing," and would "wiggle it around." State's Trial Ex. 18 at 9:47:24 to 9:49:44.[1] The first two of those touchings occurred when J.N. was five and six years old; and the last occurred when he was nine. McAllister testified he would not be surprised if J.N. had not told his father about the sexual abuse.

---

[1] State's Trial Exhibit 18 is a video recording of J.N.'s interview with McAllister, which was played for the jury. Our citations to Exhibit 18 are to the time stamps that appear on the recording.

3

At the preliminary hearing, in addition to the statements referenced in the preceding paragraphs, J.N. testified Puckett would put his hands down J.N.'s pants and "directly touch[] [J.N.'s] penis." Prelim. Hr'g Tr. at 82–83. He also said Puckett asked J.N. "to suck [Puckett's] penis," *id.* at 86, at least twice "put his [stiff] penis in [J.N.'s] mouth," *id.* at 87–88, and attempted to put his penis in J.N.'s mouth on about five other occasions, *id.* at 87. J.N. said these acts began when he was five (which would have been in 2003) and ended when he was eight (which would have been in 2006). He at first denied telling any of the DHS investigators about sexual abuse. But near the end of his testimony, J.N. said he had told one of the DHS investigators in 2007 that Puckett had touched his penis and had orally sodomized him. He added that he "told them [i.e., all the visiting DHS workers] every time what happened." *Id.* at 171; *see also id.* at 162 ("Actually I remember now that I did tell them [i.e., all of the DHS workers that came out to the house] about [Puckett] touching my penis.").

Puckett testified at trial, denying the allegations and expressing his belief that J.N.'s father and paternal grandparents had instigated the DHS visits by encouraging J.N. to make false reports. Novotny also testified that J.N. "was coerced" by his father into making accusations of physical abuse against Puckett and her. *Id.* at 1220, 1223. She sought to introduce a three-page, undated letter J.N. had purportedly written. Its exclusion is the focus of this appeal. The first page stated that J.N. did not want to live with his father. The second page read:

> Why I don't want to live with my dad[:] because I wouldn't get help with
> my homework and would always have scrapes and bruzes [sic] and
> wouldn't be helthy [sic].

4

> I turned you and doug [i.e., Puckett] into dhs because I sometimes want to live with my dad, and I would like to see my aunt Linda, cousins, and, nana and papa.
>
> You will not have to deal with dhs or me or my dad or nobody else because I will not have dhs come out anymore.

Aplt. Br., Ex. F at 2. And the third page listed reasons why he liked living with his mother and Puckett. The State objected that the letter was hearsay and that to the extent it could have been used to impeach J.N.'s credibility, it should have been raised at the preliminary hearing given that the defendants were in possession of it at that time. The trial court declined to admit the letter because it was not authenticated.

As noted, the jury convicted Puckett on numerous counts, including two counts of forcible oral sodomy of J.N. and two counts of attempted forcible oral sodomy of J.N. There were no charges of physical abuse against Puckett.

## B.     Direct appeal

On direct appeal, Puckett argued that Novotny could have authenticated the letter and that its exclusion violated his right to due process and a fair trial. The OCCA agreed Novotny could have authenticated the letter but affirmed the exclusion on other grounds. The OCCA first stated the letter "could potentially have been used to impeach J.N.'s testimony, since it suggests [he] had 'second thoughts' about one of his reports to DHS." App. 5. The OCCA determined the letter should have been brought up for impeachment purposes during J.N.'s preliminary hearing, given that the parties did not expect him to live until trial and intended to rely on the video-recorded testimony. The court noted that the record suggested "that the letter

5

may possibly have been withheld for strategic reasons until the time of trial (perhaps by the defendants, without knowledge of their attorneys)." *Id.*

The OCCA then ruled the letter was not improperly excluded because its relevance to the charges on which Puckett was tried "was quite limited." *Id.* at 6. The court observed that during a bench conference about the letter, the prosecution stated that Novotny received the letter after the first DHS investigation, while J.N. was living with his mother and Puckett, and well before J.N. first aired allegations of sexual abuse in 2009 and stopped living with them. The OCCA noted the prosecution's statement was "never countered." *Id.* Accordingly, the OCCA concluded that the letter could not be viewed as evidence J.N. was recanting his allegations of sexual abuse because it "could *not* have been written after J.N. had accused Puckett of the sexual abuse crimes upon which Puckett was tried," and "the only allegations involved in the early DHS investigations regarding J.N. were allegations of possible physical abuse." *Id.*

The court further explained "that although the letter may have had some relevance to suggest that J.N. had previously contacted DHS for reasons other than actual abuse (and then regretted doing so), the letter does not actually 'recant' anything that J.N. may have reported to DHS" or "state that anything J.N. reported to DHS was false or untrue, but rather that J.N. may have been motivated to contact DHS and 'turn in' Novotny and Puckett because he sometimes wanted to live with his dad and see other relatives (whom Novotny was apparently not allowing him to see)." *Id.* at 6–7. Hence, the court concluded that "exclusion of the letter did

6

*not* amount to a denial of Puckett's right to present a meaningful defense at trial," *id.* at 7, and rejected the notion that the letter was "highly relevant to a critical issue in the case" that might allow its admission despite hearsay or authentication concerns, *id.* at 7–8 (internal quotation marks omitted).

Significant to the issue certified for this appeal, the OCCA further held in the alternative "that any possible error in excluding this letter was harmless beyond a reasonable doubt, especially because the letter was *not* written after J.N. had accused Puckett of sexually abusing him—and certainly did not amount to any kind of 'recantation' of these allegations." *Id.* at 8. The OCCA observed the defense had presented the testimony of Dr. McNall-Knapp, who was J.N.'s oncologist from 2004 up until his death in 2009. Dr. McNall-Knapp testified that she examined J.N. in January 2009, soon after J.N. was no longer living with his mother and Puckett, and asked him what had happened, although at the time she was unaware of the sexual-abuse allegations. J.N. told her he had "'messed up.'" Trial Tr., Vol. VII at 1300. She said: "[H]oney, if somebody hit you or hurt you and you told, you did not mess up. That is what you're supposed to do. And he said, no, I wanted to live with my daddy and instead I have to live with my grandma." *Id.* The OCCA considered this testimony "much more relevant and supportive of Puckett's defense at trial, *i.e.*, that J.N. had made up the allegations of sexual abuse in order to be placed with his dad, than the letter that was excluded." App. 9. The court also pointed out that Puckett had "never offered any persuasive reason why the letter from J.N. was not raised and used to impeach him at the time of his preliminary hearing."

7

*Id.* The OCCA reiterated "that any possible error in excluding the letter was harmless beyond a reasonable doubt." *Id.*

Puckett filed a petition for rehearing, arguing the OCCA overlooked evidence that he was unaware of the existence of the letter until the eve of trial. This evidence, Puckett claimed, undermined both the OCCA's rationale that the letter should have been introduced at the preliminary hearing and its conclusion that any error in excluding it was harmless. The OCCA disagreed, explaining that in its direct-appeal opinion, it had held that "any possible error in [excluding the letter] was harmless beyond a reasonable doubt, because the letter had little relevancy to the issues at trial. When the letter may have been discovered has no bearing on that conclusion." *Id.* at 94.

### C.  Federal habeas proceedings

Puckett raised one claim in his habeas petition, that the exclusion of the letter violated his right to present a defense and was not harmless error under *Chapman v. California*, 386 U.S. 18 (1967). He contended that in denying his petition for rehearing, the OCCA had unreasonably interpreted the facts when it determined that the letter had little relevance to the trial issue. In reaching that conclusion, he argued, the OCCA had contradicted the rationale of its prior decision, which Puckett interpreted to be that the letter was relevant to impeaching J.N.'s testimony but its exclusion was harmless because Puckett had waived his right to present it by failing to do so at the preliminary hearing. He also faulted the OCCA for making a factual

finding in the first instance, namely, when the letter was written, and for failing to direct an evidentiary hearing on the issue.

A magistrate judge issued a thorough report and recommendation, concluding that the OCCA had not unreasonably applied *Chapman*. The district court summarily adopted the report and recommendation over Puckett's objections.

## II. DISCUSSION

### A. AEDPA Standards

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this appeal because Puckett filed his § 2254 petition after AEDPA's effective date. *See Hammon v. Ward*, 466 F.3d 919, 925 (10th Cir. 2006). Under AEDPA, when a state court adjudicates a claim on the merits, AEDPA prohibits federal courts from granting habeas relief unless the state court's "adjudication of the claim"

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). The OCCA's harmlessness determination in this case constitutes an adjudication on the merits. *See Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) (holding that a state court's harmlessness decision "undoubtedly constitutes an adjudication on the merits" (internal quotation marks omitted)). Hence, to obtain habeas relief, Puckett must overcome AEDPA deference. This court, however, granted a COA only on whether the OCCA *unreasonably applied* the *Chapman* harmless-error standard, and Puckett has not asked us to expand the COA. Our

9

review is therefore limited to the unreasonable-application clause of § 2254(d)(1).

*See Ross v. Ward*, 165 F.3d 793, 797 (10th Cir. 1999) (reviewing only issues included in COA and declining to expand it).

"A state court decision unreasonably applies federal law if the state court identifies the correct governing legal principle from Supreme Court decisions but unreasonably applies that principle to the facts of the prisoner's case." *Hanson v. Sherrod*, 797 F.3d 810, 824–25 (10th Cir. 2015) (brackets and internal quotation marks omitted). We presume the OCCA's factual determinations are correct, but Puckett may rebut that presumption with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). In reviewing a state court decision under § 2254(d)(1), our inquiry "is limited to the record that was before the state court that adjudicated the claim on the merits," *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), and "we review the district court's legal analysis of the state court decision *de novo* and its factual findings, if any, for clear error," *Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014) (internal quotation marks omitted).

## B.   Harmless Error Standards

"The test for whether a federal constitutional error was harmless depends on the procedural posture of the case." *Ayala*, 135 S. Ct. at 2197. On direct appeal, the *Chapman* harmless-error standard applies. *Id.* That standard requires the reviewing court to "'be able to declare a belief that [the error] was harmless beyond a reasonable doubt.'" *Id.* (quoting *Chapman*, 386 U.S. at 24). But in federal habeas proceedings, the *Brecht* test applies, which requires a petitioner to establish that the

10

constitutional error "resulted in 'actual prejudice.'" *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  Under *Brecht*, "relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 2197–98 (internal quotation marks omitted).

The *Brecht* standard differs from the *Chapman* standard, "but that does not mean . . . that a state court's harmlessness determination has no significance under *Brecht*." *Id.* at 2198.  Instead, "the *Brecht* standard subsumes the requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under *Chapman*." *Id.* (internal quotation marks omitted).  Hence, although "a federal habeas court need not formally apply both *Brecht* and AEDPA/*Chapman*, AEDPA nevertheless sets forth a precondition to the grant of habeas relief." *Id.* (brackets and internal quotation marks omitted).

Under AEDPA, "we may not overturn the [OCCA's] decision unless that court applied *Chapman* in an objectively unreasonable manner." *Id.* (internal quotation marks omitted).  "When a *Chapman* decision is reviewed under AEDPA, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." *Id.* at 2199 (internal quotation marks omitted).  "And a state-court decision is not unreasonable if fairminded jurists could disagree on its correctness." *Id.* (brackets and internal quotation marks omitted).  Puckett must therefore show that the OCCA's determination that exclusion of the

11

letter was harmless "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (internal quotation marks omitted).

### C.     Application of *Brecht*/AEDPA/*Chapman*

In his first attack on the OCCA's decision, Puckett claims there is an inconsistency between that court's opinion deciding his direct appeal and its order denying his petition for rehearing, and appears to argue that the OCCA's first opinion—which he again characterizes as one based on the notion that the trial court did not abuse its discretion in excluding the letter because Puckett could have introduced it during J.N.'s preliminary hearing—should control. Like the magistrate judge, we see no inconsistency in the two rulings, and Puckett has plainly misread the first. In that ruling, the OCCA observed that the letter could have been introduced at the preliminary hearing for impeachment purposes, but it analyzed the exclusion of the letter, including the harmlessness of any constitutional error, under relevance principles. It reiterated its relevance rationale in the order denying rehearing. We therefore reject Puckett's arguments on this front.

Ostensibly turning to whether the OCCA reasonably applied *Chapman*, Puckett contends that exclusion of the letter would be "palatable" but for "[t]he lack of credible testimonial evidence, complete lack of forensic evidence, and the

12

testimony from adults to whom the children[2] admitted lying about their allegations (or gave a different account of the story)." Aplt. Br. at 13–14. He argues these alleged shortcomings "give rise to the argument that a fundamental miscarriage of justice will occur unless this Court grants the Writ" because he is actually innocent. *Id.* at 14. This line of argument misstates the standard of review under AEDPA, which we set forth above and which is *not* whether denying relief would result in a miscarriage of justice because Puckett is actually innocent.[3]

Furthermore, this line of argument is unpersuasive. Puckett points to arguments and record citations set forth in the brief he filed in the district court in support of his habeas petition, which we have reviewed.[4] Most of that evidence is testimony that J.N. did not report sexual abuse before the forensic interview with McAllister, which tends to support the OCCA's view that the letter had little to do with the sexual-abuse allegations. The only portion of the cited evidence that might support Puckett's argument is McAllister's testimony that J.N. said Puckett never exposed himself to J.N. Puckett contended that was important because J.N. later

---

[2] Puckett was also tried and convicted on sexual-abuse charges relating to J.N.'s sister.

[3] Miscarriage of justice and actual innocence are relevant to excusing a habeas petitioner's procedural default. *Frost*, 749 F.3d at 1231. Procedural default is not an issue here.

[4] Our general rule is that incorporation of district court filings is not "acceptable argument," and "arguments not set forth fully in the opening brief are waived." *Gaines-Tabb v. ICI Explosives, USA, Inc.*, 160 F.3d 613, 623–24 (10th Cir. 1998). But given that Puckett's liberty is at stake, we have examined the record citations in Puckett's habeas brief.

alleged that Puckett had indeed exposed himself when he allegedly attempted to and did orally sodomize J.N., and J.N. had testified that he in fact told McAllister that Puckett had orally sodomized him. But McAllister testified that sometimes a child might disclose more sexual abuse, or more severe sexual abuse, after the initial forensic interview, and that J.N.'s "comfort level" during McAllister's interview might not have been sufficient for him to disclose that Puckett had orally sodomized him. Trial Tr., Vol. IV at 755–57. Moreover, the letter simply has no relevance as to the inconsistency between J.N.'s testimony and McAllister's. We are therefore unpersuaded by Puckett's argument.

Puckett next argues that because the trial court never determined when the letter was written, the OCCA lacked "jurisdiction to consider such facts, much less make a determination as to when the child wrote the letter and to which allegations the letter applied." Aplt. Br. at 19. Those determinations, Puckett argues, are jury questions. But he has offered no support for this theory, let alone identified what clearly established Supreme Court determination of federal law might apply, which is his burden under AEDPA. *See Owens v. Trammell*, 792 F.3d 1234, 1242 (10th Cir. 2015).

Even so, in determining when the letter was written, the OCCA analyzed the bench conference at which the prosecutor informed the trial judge, in the presence of opposing counsel, that "defense counsel" had told him Novotny had received the letter "after the first DHS investigation" and that counsel could "correct [him] if [he] was wrong." Trial Tr., Vol. VI at 1204. Shortly after, the prosecutor stated more

14

specifically that Puckett's attorney (Novotny had separate counsel) had told him the letter was written "after the first DHS investigation." *Id.* at 1207. Neither Puckett's attorney nor Novotny's corrected the prosecutor's statements. In our view, therefore, even if the OCCA's determination about the timing of the letter could be characterized as a factual finding (a proposition we doubt), it was based on a tacit admission by Puckett's trial counsel that the letter was in fact authored after the first DHS investigation. We therefore see no basis to conclude that the OCCA exceeded its authority in analyzing the record and determining that the letter was written long before J.N. first aired allegations of sexual abuse in January 2009. Further, Puckett has not challenged the substance of the OCCA's determination, but only, as just explained, its authority to make that determination. Accordingly, we discern no basis to deem the OCCA's timing determination unreasonable.

The OCCA's related conclusion that the letter had little relevance to the allegations of sexual abuse flows naturally from the fact that when J.N. wrote the letter, he had not yet made those allegations. As discussed above, J.N. gave some equivocal testimony on that point, but the three DHS workers who investigated between 2006 and 2008 all testified J.N. made no allegations of sexual abuse, and part of Puckett's theory of the case was that J.N. never made such allegations until January 2009. Further, the OCCA reasonably concluded that in the letter, J.N. did not actually recant anything, and even if the letter could be interpreted as a recantation, it would at most concern the allegations of physical abuse J.N. had

15

conveyed to DHS. Puckett has not shown that the OCCA was unreasonable in concluding that the letter did not relate to the allegations of sexual abuse.

The final line of relevant argument we discern in Puckett's opening brief is that because "jurors react more strongly than judges to certain evidence," the letter had to be shown to the jury. Aplt. Br. at 21. Puckett contends that "[n]o reasonable juror would ignore the fact that [J.N.'s] 1) frame of mind, 2) level of maturity, 3) simplistic writing style, 4) unfamiliarity with the topic of sex and, 5) embarrassment that he lied were reasons that would prevent [him] from articulating each allegation he made and then specifically recanting them." *Id.* at 20. But even assuming the letter could be construed as a recantation, J.N. could not have recanted allegations he had not yet made.

Additional trial testimony supports our conclusion that the OCCA's harmlessness determination was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Ayala*, 135 S. Ct. at 2199 (internal quotation marks omitted). First, the OCCA concluded Dr. McNall-Knapp's testimony was more probative of J.N.'s credibility regarding the sexual-abuse allegations. We cannot say that conclusion was unreasonable given that the statement J.N. made to her—that he had "messed up" and had to live with his grandmother instead of his father, Trial Tr., Vol. VII at 1300—occurred after he had reported the sexual abuse. Second, when J.N. went to the children's shelter on January 11, 2009, he told DHS specialist Williamson that he wanted to live with his dad. Third, and perhaps most importantly,

16

the jury heard J.N. himself twice state that he wanted to live with his father. He first said so during a line of cross examination designed to uncover whether anyone had coached him on what he might have to do to move to his father's house, which was a critical part of Puckett's theory of the case. And he also testified he told one of the DHS investigators (in May 2008) about the physical abuse because he wanted to live with his father. That statement is materially indistinguishable from the statement in the excluded letter that J.N. had reported Puckett and his mother to DHS because he wanted to live with his father. Hence, the jury had a great deal of significantly probative evidence supporting Puckett's theory of the case, and this additional evidence buttresses our conclusion that the OCCA's harmlessness analysis must stand under the deferential standard AEDPA imposes.[5]

### III. CONCLUSION

The judgment of the district court is affirmed. Appellee asks us to strike Exhibit G to Puckett's opening appellate brief, which is a copy of the National Register of Exonerees, because our review is limited to the record that was before the

---

[5] In his reply brief, Puckett broaches several issues that he never raised before the OCCA, in the district court, or in his opening appellate brief. *See* Aplt. Reply Br. at 4 (abuse of prosecutorial power rising to plain error), 5 (double jeopardy, ineffective assistance of counsel), 9 (Confrontation Clause). He has provided no reason for us to overlook the multiple impediments to our consideration of such belatedly-made arguments. *See* 28 U.S.C. § 2254(b)(1) (requiring a § 2254 petitioner to first exhaust available state court remedies); *Hicks v. Gates Rubber Co.*, 928 F.2d 966, 970 (10th Cir. 1991) (stating "the general rule that an appellate court will not consider an issue raised for the first time on appeal"); *United States v. Murray*, 82 F.3d 361, 363 n.3 (10th Cir. 1996) ("We decline to consider arguments raised for the first time in a reply brief.").

OCCA when it issued the decisions under review. We have not considered that exhibit and therefore deny the State's request as moot.

Entered for the Court


Timothy M. Tymkovich
Chief Judge